**CALORIC CORPORATION, Petitioner,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (SHOE-MAKER), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs March 2, 2001.

Decided July 1, 2002.

Deborah A. Rocco, Philadelphia, for petitioner.

Ruth Skoglund, Allentown, for respondent.

Before: DOYLE, Senior Judge,[1] and SMITH–RIBNER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge DOYLE.

Caloric Corporation (Employer) petitions for review of an order of the Workers' Compensation Appeal Board (Board) that affirmed the order of a Workers' Compensation Judge (WCJ), which had granted the claim petition of Stewart Shoemaker (Claimant) for specific loss benefits for the loss of his hearing in both ears.

Claimant worked for Employer as a "dipper and flow coater" in its enamel department from May 1948 until November 16, 1990. He worked for no other

---

1. This case was assigned to the opinion writer prior to the date when President Judge Doyle assumed the status of senior judge on January 1, 2002.

employer during this entire time or thereafter. On November 2, 1993, Claimant filed a claim petition for the loss of use of his hearing in both his right and left ears, alleging that he suffered a gradual loss of hearing as the result of exposure to loud noises while working for Employer. He further alleged in his claim petition that, by letter of October 25, 1993, he had given notice of his injury to Employer. Employer filed a timely answer denying all material allegations and asserting as a defense that Claimant had failed to provide timely notice of his alleged claim pursuant to Section 311 of the Workers' Compensation Act (Act).[2]

In support of his petition, Claimant testified that he had worked for Employer in a one-story building, approximately 200 feet by 200 feet. Claimant was required to take metal parts out of a large basket and place them into a vat, to which wet porcelain was added, and hang up the coated metal parts on a line. The parts were then passed through a fan and a spray booth. He was exposed to loud noise from exhaust fans, at least five intake fans, air nozzles and presses. When he began to suffer hearing loss in his left ear in 1984, he obtained a hearing aid from a clinic but did not seek medical treatment at that time, but did seek medical treatment from Robert D. Strauss, M.D., on March 6, 1992.

Claimant submitted the deposition medical testimony of Dr. Strauss, board certified in otolaryngology, who stated that he first saw Claimant on March 6, 1992, and conducted a hearing test, which revealed that Claimant had a "dead" right ear and a severe hearing loss in the left ear. His impression at that time was that Claimant's hearing loss was probably due to severe noise exposure at work. However, to rule out a tumor or otosclerosis,[3] a condition which Claimant's brother had, Dr. Strauss recommended that Claimant undergo a CT scan of the ears. He also recommended that Claimant wear a Cros aid, which is an amplification device.

Dr. Strauss saw Claimant again on September 9, 1993. Since Claimant had not undergone the recommended CT scan, Dr. Strauss again urged Claimant to have a CT scan performed, which he did on September 14, 1993. After reviewing the results, Dr. Strauss determined that Claimant did not have a tumor and did not have otosclerosis. He determined that the most likely cause of Claimant's hearing loss was a combination of an inherited condition and excessive noise exposure. He called Claimant on September 21, 1993, notified him of the results of the CT scan, and told Claimant to return for a checkup in one

2. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 631. Section 311 provides, in part, as follows:

Unless the employer shall have knowledge of the occurrence of the injury, or unless the employe or someone in his behalf ... shall give notice thereof to the employer within twenty-one days after the injury, no compensation shall be due until such notice be given, and, unless such notice be given within one hundred and twenty days after the occurrence of the injury, no compensation shall be allowed. However, in cases of injury resulting from ionizing radiation or any other cause in which the nature of the injury or its relationship to the employment is not known to the employe, the time for giving notice shall not begin to run until the employe knows, or by the exercise of reasonable diligence should know, of the existence of the injury and its possible relationship to his employment.
77 P.S. § 631.

3. Otosclerosis is "[a] new formation of spongy bone ... resulting in progressively increasing deafness, without signs of disease in the eustachian tube or tympanic membrane." STEDMAN'S MEDICAL DICTIONARY 1113 (25th ed.1990).

year. Claimant's wife testified that she and her husband received Dr. Strauss' report for the first time on October 16, 1993. Later, based on an October 31, 1995, audiogram, Dr. Strauss gave Claimant a binaural hearing loss rating of 83.9% pursuant to the Impairment Guides as required by Section 306(c)(8)(i) of the Act, 77 P.S. § 513(8)(i).[4]

The WCJ determined that Claimant suffered binaural hearing loss caused by exposure to occupational noise during his employment with Employer. He found that the injury occurred on November 16, 1990, Claimant's last day of work, and the date of his last exposure to hazardous occupational noise. He also concluded that Claimant knew or should have known that his permanent loss of hearing was related to his exposure to hazardous occupational noise, at the earliest, on September 21, 1993, when Dr. Strauss notified him of the results of the CT scan, and, at the latest, on October 16, 1993, when he was provided with a copy of Dr. Strauss's report identifying the extent of his loss and its relationship to his injury. Furthermore, the WCJ concluded that Claimant notified Employer of the work injury by filing his claim petition with service upon Employer on November 2, 1993, which was well within 120 days of the date Claimant knew or should have known of the work-relatedness of his hearing loss, as required by Section 311 of the Act. Accordingly, the WCJ granted Claimant's claim petition.

■ Employer then appealed to the Board, which affirmed the WCJ's decision, and now brings the instant appeal to this Court. The issue before us is whether Claimant gave Employer notice of his work injury within 120 days of the date he knew, or through the exercise of reasonable diligence should have known, of the existence of the injury and its relationship to his employment, pursuant to what is commonly referred to as the "discovery rule" set forth in Section 311 of the Act.

■ Whether a claimant has complied with the 120–day notice requirement found in Section 311 of the Act is a question of fact to be determined by the WCJ. *Socha v. Workers' Compensation Appeal Board (Bell Atlantic PA)*, 725 A.2d 1276 (Pa. Cmwlth.1999) (*Socha I*), *affirmed*, 566 Pa. 602, 783 A.2d 288 (2001) (*Socha II*). A claimant's belief, without more, that his hearing loss is work-related does not begin the running of the statute of limitations under the Act. *Id.* The mere knowledge or suspicion of significant hearing loss and a *possible* causal relationship with employment is not sufficient evidence that a compensable hearing loss has occurred. *Id.*

Employer contends that Claimant knew of the extent of his hearing loss and its possible relationship to his employment no later than March 6, 1992, the date Dr. Strauss first evaluated Claimant and told him that he had a "dead ear" on the right side and a profound sensorineural hearing loss in the left ear, and that his ears were probably damaged due to his noise exposure at work. Employer therefore argues that Claimant failed to give notice of the work injury within 120 days of March 6, 1992. Claimant argues, on the other hand, that Dr. Strauss was not sure on March 6, 1992, that his hearing loss was due to noise exposure from work and ordered Claimant to undergo a CT scan in order to rule out other causes.

---

4. Section 306(c)(8)(i) of the Act provides a schedule of compensation based on the percentage of hearing impairment calculated under the "Impairment Guides." The term "Impairment Guides" is defined by Section 105.5 of the Act, 77 P.S. § 25.5, to mean the "American Medical Association's Guides to the Evaluation of Permanent Impairment, Fourth Edition (June 1993)."

Both this Court and the Supreme Court addressed this very issue in the *Socha* decision. There, the WCJ determined that the claimant knew in 1990 that he suffered from significant hearing loss caused by his employment when a physician told him during a commercial driver's license physical examination that his hearing loss might prohibit him from receiving a commercial driver's license in the future. The claimant gave his employer notice of the injury on September 25, 1995, and the WCJ concluded that the claimant had not satisfied the notice requirement in Section 311 of the Act because he had not given his employer notice of his hearing loss within 120 days of the date that he knew he had a compensable injury. We reversed the Board's affirmance of the WCJ's decision, determining that the claimant's mere knowledge that he had a hearing loss in 1990 did not trigger the time for giving notice to the employer under Section 311 of the Act. Rather, this Court stated the following: "A claimant cannot be charged with the knowledge that he or she has suffered a compensable partial hearing loss until the claimant is [so] informed by a physician or other health care provider...." *Socha I*, 725 A.2d at 1281. Because the claimant filed his claim petition on September 25, 1995, less than three weeks after a doctor preliminarily informed the claimant's counsel on September 6, 1995, that the claimant had suffered a hearing loss secondary to industrial noise, we remanded the case for a calculation of benefits.

On appeal by the employer to the Pennsylvania Supreme Court in *Socha II*, the claimant argued that Section 306(c)(8)(ix) of the Act, 77 P.S. § 513(8)(ix), aligns the claimant's date of injury with the date of filing of the claim petition and, therefore, application of the discovery rule is not necessary. Section 306(c)(8)(ix) provides as follows:

> The date of injury for occupational hearing loss under subclause (i) of this clause shall be the earlier of the date on which the claim is filed or the last date of long-term exposure to hazardous occupational noise while in the employ of the employer against whom the claim is filed.

The employer argued, on the other hand, that Section 306(c)(8)(ix) refers to the date of injury only for purposes of calculating benefits and does not refer to the injury date for purposes of calculating whether notice is timely under Section 311. In a plurality decision,[5] the Supreme Court refused to limit Section 306(c)(8)(ix) to calculation of benefits determinations and, on different grounds, affirmed the decision of the Commonwealth Court, holding that the claimant satisfied the 120–day notice requirement of Section 311 when he filed his claim petition. Nevertheless, the Supreme Court in *Socha II* specifically noted that its reasoning had no effect on the application of Section 311's discovery rule in cases where a claimant "has been free, for a period of longer than 120 days, from exposure to hazardous occupational noise under the employer from whom compensation is sought." *Socha II*, 566 Pa. at 611 n. 8, 783 A.2d at 293 n. 8.

We therefore hold that the discovery rule applies in this case. Unlike the claimant in the *Socha* decision who had not stopped working for his employer at the time he filed his claim petition, Claimant, in this case, stopped working on November 16, 1990, almost three years before he filed

---

5. We recognize that, as a plurality opinion that announces the judgment of the Court, *Socha II* does not have precedential value but is merely persuasive authority. *See Beaver v.* *Ortenzi*, 105 Pa.Cmwlth. 361, 524 A.2d 1022 (1987). We need not, however, comment significantly on the reasoning in *Socha II*, since the case herein is distinguishable.

his claim. The WCJ found that Claimant first knew, or should have known, of the relationship between his hearing loss and his employment on September 21, 1993, when Dr. Strauss notified Claimant of the results of the CT scan.

In the present case, Dr. Strauss testified as follows:

My impression [on March 6, 1992] was that in all probability, the severe nerve loss was probably secondary to his severe noise exposure in the foundry over many years, and there certainly was *also* a history that could also be a familial tendency in the family.

. . . .

On my first visit, March 6th, 1992 ..., [Claimant] was advised that his hearing loss is all probably damage[ ] due [to] his previous noise exposure from the foundry. So it was on the first visit that I told him, and that was in a response to his hope that it was something correctable. I said this did not appear to be the same disease his brother had.

In my opinion his loss was due to his noise exposure, a whole different problem. He basically came in hoping he had the same problem as his brother and he had assumed that it was the foundry noise and he was wrong. That was what his whole hope was.

(Notes of Testimony, N.T., Deposition of Dr. Robert D. Strauss, June 16, 1994, at 7, 49–50) (emphasis added). Dr. Strauss also testified that, following his initial evaluation of Claimant on March 6, 1992, he ordered a CT scan to rule out an acoustic neuroma.[6] He testified as follows:

[T]he point of ordering a CT scan is that one disease that can produce this kind of symmetric profound loss is an acoustic neuroma.... So you want to make sure they don't have something like that and they're not being misdiagnosed not knowing because they would have no other symptoms that would give a clue.

The other thing that I had in the back of my mind is with his brother having a history of otosclerosis, that is an inherited disease and otosclerosis can invade the inner ear. It is called cochlear otosclerosis. It's less common. It would progress, but it has been described as affecting the inner ear only, and so I ordered a special kind of CAT scan called a thin slice.

... I felt that without any other explanation, the most likely cause was a combination of an inherited tendency with excessive profound noise to his ears over those 40 some years which was probably the major cause of the loss.

(N.T., Deposition of Dr. Strauss at 10–11).

Reviewing the above testimony as a whole, it reveals that, on Claimant's first visit with Dr. Strauss on March 6, 1992, Dr. Strauss thought that Claimant's hearing loss *might* probably be due to noise exposure at work, but he was unsure as to whether Claimant's hearing loss was also due to the familial problem of otosclerosis, so he ordered a CT scan of the ears. Further, although Claimant thought then that he *might* have a work-related hearing loss, he was also hoping at the same time that he might have the inherited disease of otosclerosis, which is correctable. It was not until September 21, 1993, after receiving the results of the CT scan, that Dr. Strauss ruled out otosclerosis and an acoustic neuroma and notified Claimant that he did indeed suffer from occupationally induced hearing loss. That date, un-

---

6. An acoustic neuroma is a "[b]enign tumor of the eighth cranial nerve." Acoustic Neuroma Association Homepage, Glossary of Terms (1998), *available at* http://www.anausa.org/glossary.htm (May 8, 2002).

der those circumstances, began the running of the 120–day notice period under Section 311 of the Act.

According to the WCJ, Claimant gave Employer notice of his work injury by filing his claim petition with service on Employer on November 2, 1993, which was a date within 120 days of September 21, 1993. Therefore, the WCJ did not err in deciding that Claimant gave Employer timely notice of the work injury, and we affirm.

Judge SMITH–RIBNER concurs in result only.

## ORDER

AND NOW, this *1st* day of *July,* 2002, the order of the Workers' Compensation Appeal Board in the above-captioned matter is hereby affirmed.