554 A.2d 579

Raymond M. Hartman, Petitioner *v.* Commonwealth of Pennsylvania, State Board of Optometry, Respondent.

Argued October 6, 1988, before Judges CRAIG and MCGINLEY, and Senior Judge NARICK, sitting as a panel of three.

*Nicholas H. Krayer*, for petitioner.

*Thomas F. Halloran*, Senior Deputy Attorney General, with him, *John G. Knorr, III*, Chief Deputy Attorney General, Chief of Litigation Section, and *LeRoy S. Zimmerman*, Attorney General, for respondent.

OPINION BY SENIOR JUDGE NARICK, February 15, 1989:

The Pennsylvania State Board of Optometry (Board) suspended Raymond M. Hartman's (Petitioner's) license to practice optometry for a period of three years for practicing optometry while his license was under suspension. We affirm.

The Board originally suspended Petitioner's license for ninety days in 1981 for misleading advertising practices. This Court affirmed the suspension in *Hartman v. State Board of Optometrical Examiners*, 71 Pa. Commonwealth Ct. 110, 454 A.2d 1150 (1983) *(Hartman I)*. Following that decision, Petitioner surrendered his license to the Board for the suspension period, February 23, 1983 to May 19, 1983.

On June 13, 1983, the Board issued its original citation and rule to show cause why Petitioner's license should not be revoked for practicing optometry on April 29, 1983, while his license was under suspension, by examining the eyes of and prescribing and furnishing glasses for Mary Gigliotti, an occupational license inspector for the Bureau of Professional and Occupational Affairs. This original citation was later amended on August

23, 1983 to include Petitioner's furnishing of the same services to two other patients during the suspension period.

The first hearing on these charges was scheduled for August 31, 1983. The Board filed a petition for continuance on August 17, 1983, to which Petitioner had no objection. The Board rescheduled the hearing for October 12, 1983.

On October 12, 1983, the hearing examiner appointed by the Board convened the hearing. Neither petitioner nor his attorney, Mr. Krayer, was present. The prosecuting attorney informed the hearing examiner that Mr. Krayer had telephoned him the morning of the hearing to request a continuance because he (Krayer) had suffered an accident the evening before in Philadelphia and was unable to make the trip to Harrisburg. The hearing examiner granted the continuance and the hearing was rescheduled for October 19, 1983.

Mr. Krayer appeared for the October 19 hearing and moved for a continuance because Petitioner had a problem with his leg and was unable to drive from his home in western Pennsylvania to Harrisburg. After questioning the attorney regarding the nature of the illness and when he had been informed of the problem,[1] the hearing examiner denied the request. Mr. Krayer voiced no further objection and the hearing proceeded. Although Petitioner's counsel cross-examined the prosecution witnesses, Petitioner presented no evidence of his own to refute the charges against him.

---

[1] Petitioner's counsel explained that he had learned of Petitioner's problem the day before, upon returning to his office at approximately 5:00 p.m. He did not attempt to contact the prosecutor or the hearing examiner at that time. The attorney was unable to state exactly what the problem with Petitioner's leg was and did not know whether Petitioner was ambulatory. Petitioner told him he had seen a Dr. Taylor in Beaver County.

At the conclusion of the hearing, the hearing examiner established a briefing schedule. Several days after the deadline for filing Petitioner's brief had passed, the prosecutor filed a motion to close time for filing of briefs. In apparent response to this motion, Petitioner filed two undated motions, a motion to reconvene the hearing because of Petitioner's absence[2] and a motion for extension of time in which to file a brief. The hearing examiner granted only the latter motion.

On January 26, 1984, the hearing examiner submitted his proposed report to the Board, which ultimately entered its adjudication and order on August 6, 1984. Because Petitioner had never been served with a copy of the proposed report and had therefore been deprived of the opportunity to file exceptions, he petitioned for review of the Board's order and this Court remanded to correct the administrative error in *Hartman v. State Board of Optometrical Examiners*, 96 Pa. Commonwealth Ct. 291, 507 A.2d 878 (1986) *(Hartman II)*.

The procedural improprieties having been corrected, the matter is now before us to review the Board's order of suspension. Petitioner has raised the following issues for our consideration: 1) whether the Board's determination that Petitioner was practicing optometry is supported by the evidence; 2) whether Petitioner was unduly prejudiced by the hearing examiner's refusal to grant a second continuance; 3) whether Petitioner was prejudiced by the Board's refusal to schedule a hearing at which Petitioner could demonstrate his compliance with Section 244.7(c) of the Optometric Practice and Licensure Act (Act), Act of June 6, 1980, P.L. 197, *as amended*, 63 P.S. §244.7(c); and 4) whether the Board and Board

---

[2] Notes from a medical doctor and a chiropractor, neither of whom was named Taylor, were attached to the motion.

counsel exhibited such a bias against Petitioner so as to deprive him of his right of due process.

We shall address these issues seriatum, being mindful that our scope of review is limited to a determination of whether constitutional rights have been violated, whether an error of law has been committed and whether necessary findings of fact are supported by substantial competent evidence. Section 704 of the Administrative Agency Law, 2 Pa. C. S. §704; *Hartman I.*

The essence of Petitioner's first argument is that he was practicing opticianry, not optometry, during the suspension period. Because opticians are not required to be licensed in Pennsylvania, Petitioner argues, the Board had no jurisdiction over his actions.

"Practice of Optometry" is defined in the Act as follows:

> The use of any and all means or methods for the examination, diagnosis and except for drugs or surgery, treatment of conditions of the human visual system and shall include the examination for, and adapting and fitting of, any and all kinds and types of lenses including contact lenses.

Section 244.2 of the Act, 63 P.S. §244.2.

At the hearing on the charges against Petitioner, the prosecutor presented the testimony of Mary Gigliotti, and the deposition testimony of Irene Moore and William Rosinsky. All three described visits to Petitioner's office during the suspension period. Each described the procedures followed by Petitioner and the equipment he used. Mary Gigliotti specifically testified that she had asked Petitioner for glasses to replace a pair she had broken and that the ones she received from Petitioner were different (better) than the pair she was wearing when she saw Petitioner on April 29, 1983.

The prosecution also presented the expert testimony of Dr. Joseph Shovlin,[3] an optometrist, who opined, from hearing the lay descriptions of the equipment Petitioner had used in examining the three patients mentioned above, that Petitioner was using equipment commonly used in optometrical practice for refracting and diagnosing the ailments of the eyes. The doctor defined refraction as "determin[ing] what prescription is needed in order to prescribe a proper pair of glasses to alleviate the problem patients may have ... ." (Notes of Testimony, [N.T.], October 19, 1983, p. 85) He further described refraction as a diagnostic procedure. (*Id.*) When Dr. Shovlin was asked to distinguish between an optician and an optometrist, he stated that the primary difference was that an optician does not diagnose or refract the eye, but merely fills prescriptions for lenses which are written by either an ophthalmologist or an optometrist.

We have thoroughly reviewed the record in this case and find ample support for the Board's conclusion that Petitioner was practicing optometry during the period of his license suspension.[4]

---

[3] Petitioner's counsel did not question Dr. Shovlin's qualifications to serve as an expert.

[4] Petitioner claims that Dr. Shovlin's testimony "should have been ruled inadmissible for lack of adequate factual support," (Brief p. 13) largely because the doctor characterized one of his opinions, regarding the identity of the third piece of equipment described by William Rosinsky, as "an educated guess." We reject this argument for two reasons. Firstly, at no point did Petitioner object to either the doctor's qualifications or his testimony. Secondly, even if we were to disregard the doctor's "educated guess," there is still ample testimony to establish that Petitioner was engaged in the practice of optometry when he used the other two pieces of equipment, described as a phoroptor and a direct ophthalmoscope, to diagnose the three patients' visual problems and furnish lenses to correct those problems.

Petitioner's second argument is that he was prejudiced by the hearing examiner's failure to grant a second continuance. As Petitioner acknowledges, the grant or denial of a continuance is within the sound discretion of the agency involved. We will not disturb the exercise of that discretion except in cases where it has clearly been abused. *See, e.g., Roche v. State Board of Funeral Directors*, 63 Pa. Commonwealth Ct. 128, 437 A.2d 797 (1981); *Blackledge v. Pennsylvania State Police*, 62 Pa. Commonwealth Ct. 188, 435 A.2d 309 (1981).

In assessing the reasonableness of the hearing examiner's denial of the continuance, we have the benefit of his written decision explaining the factors he considered in ruling upon Petitioner's motion to reconvene. The medical documentation which was attached to Petitioner's motion (which the hearing examiner assumed to be true) indicated that Petitioner's chiropractor ordered strict bed rest for Petitioner as of October 17, 1983. The hearing examiner deemed it significant that Petitioner did not inform his counsel of this fact until the next day. Secondly, the hearing examiner was of the opinion that the medical documentation, which attested to Petitioner's pain, did not address the question of whether the Petitioner was able to attend the hearing or whether attendance would be inimical to his health. Thirdly, the hearing examiner found it significant that Petitioner's counsel made no attempt to contact either the hearing examiner or the prosecutor when he learned of Petitioner's illness at 5:00 p.m. the day before the hearing. Fourthly, the hearing examiner was disturbed by the fact that Petitioner's counsel, having already been granted one emergency continuance, made no attempt at the hearing to either document Petitioner's illness or provide detailed information regarding his condition. Finally, specifically with respect to the motion to reconvene and

the medical documentation attached thereto, the hearing examiner noted that that request was not made until December 1, 1983, some forty-two days after the October 19 hearing.

In addition to the reasons advanced by the hearing examiner, we note that Petitioner was represented at the hearing and that his attorney cross-examined the prosecution witnesses. This distinguishes his situation from that of the petitioner in *Roche*, who was denied a continuance to secure the presence of his counsel when he appeared for what he reasonably believed to be an informal hearing. Petitioner's only attempt to allege undue prejudice here is vague at best; his counsel merely avers that "the testimony of the Petitioner . . . would have shed a great deal of light on the questions involved in the case." (Brief p. 16) As this Court noted in *Roche*, the chief consideration is whether the interests of justice have been furthered. Given the Petitioner's lack of diligence, both prior to requesting the continuance and after it had been denied, we are unable to conclude that the Board has abused its discretion.

Petitioner's third allegation of error is that the Board improperly denied his repeated requests to schedule a hearing to enable him to demonstrate that he is no longer in violation of the Act. For this proposition, he relies upon Section 244.7(c), which provides that "[a] person affected by any action of the board under this section shall be afforded an opportunity to demonstrate that he is no longer in violation of this section." We read this section to require that the Board offer Petitioner an opportunity to be heard in defense of an action for one or more of the enumerated violations of Section 244.7. This the Board did when it scheduled the October 12 hearing, later continued to October 19. The section does not afford

Petitioner an ongoing right to request subsequent hearings covering the same subject matter.[5]

Petitioner's final argument is that the Board's action and that of its counsel, Alexandra Matthews, demonstrate such a bias and prejudice against him as to deny him his right of due process of law. After carefully examining the record, we must disagree.

Petitioner first asserts that a continuing pattern of bias exists, dating back to 1977 when he was first cited by the Board, which later dropped this initial prosecution. However, the record contains no details of these prior dealings until the citation for misleading advertising which ultimately resulted in Petitioner's ninety-day suspension, which we affirmed in *Hartman I*. Therefore, we find no substantiation for Petitioner's claim of bias on that ground.

Petitioner next argues that the Board is inherently prejudiced because it is the body initiating the disciplinary proceedings, and ultimately ruling upon them. Our decisions have recognized that "a not insignificant number of our State administrative agencies . . . are authorized under their operative statutes to investigate possible violations of the law, to act as complainant in enforcement proceedings and to adjudicate enforcement proceedings, including those initiated by the agency as complainant," and that this process "does not render its adjudication invalid per se." *Bruteyn Appeal*, 32 Pa. Commonwealth Ct. 541, 547, 380 A.2d 497, 500-01 (1977). *See also Scalzi v. City of Altoona*, 111 Pa. Commonwealth Ct. 479, 533 A.2d 1150 (1987). Petitioner has pointed to no specific

---

[5] In addition, it is not clear, under the facts of this case, how an opportunity to demonstrate subsequent compliance with the Act would aid Petitioner's cause. The specific violation here at issue, practicing optometry while under a license suspension, necessarily ceased upon return of Petitioner's license following the three-month suspension.

commingling of prosecutorial and adjudicatory functions (as he attempted to do in *Hartman I*), and we can find no support in the record for his very general allegations of bias.

The third ground upon which Petitioner seeks to demonstrate bias is the situation which gave rise to *Hartman II*: the Board's failure to forward to Petitioner a copy of the hearing examiner's proposed report. Our action in remanding in *Hartman II* was designed to correct this obvious administrative error. Petitioner claims that the Board's subsequent actions demonstrate that it gave the case the minimum possible attention and proceeded to reinstate its three-year suspension. We must disagree with Petitioner's characterization, and note that the Board promptly complied with our remand order in *Hartman II* by serving the proposed report upon Petitioner three days after our opinion was filed, accompanied by an order setting a schedule for the filing of exceptions. Despite Petitioner's late filing, the Board nonetheless accepted and ruled upon Petitioner's exceptions.

Petitioner next alleges bias by virtue of the Board's denial of ninety-three petitions to intervene filed between June 19 and September 19, 1986 by Petitioner's patients. The record does not indicate that those patients themselves took any action with respect to the Board's denial of their petitions as untimely. Obviously, such petitions are designed to protect the rights of those affected by or having an interest in a proceeding before an administrative agency, *see* 1 Pa. Code §35.27, a right which Petitioner may not assert in their stead. *See, e.g., Barasch Public Utility Commission*, 119 Pa. Commonwealth Ct. 81, 94, n.7, 546 A.2d 1296, 1302, n.7 (1988).

Petitioner's fifth allegation of bias arises as a result of the Board's grant of an extension of time to the prosecutor

to file a brief in response to Petitioner's exceptions. This request was filed the day the brief was to have been due. The Board granted the request, in an order mailed June 3, 1986, in which it gave Petitioner the opportunity to object within ten days. Petitioner's objection to the extension was received by the Board on June 16, 1986. In an order dated September 24, 1986, the Board noted that Petitioner's objection was not timely; however, it nonetheless proceeded to address the merits of the issues raised by Petitioner. Here again, Petitioner has not alleged that there has been any improper commingling of functions between the prosecutor and the Board or its counsel such as was the case in *Bruteyn Appeal.* Particularly given the Board's practice of excusing Petitioner's failures in complying with various time requirements, we fail to see how the grant of an extension of thirty days to the prosecution in order to file a brief, by itself, constitutes evidence of a bias against Petitioner.

Finally, Petitioner claims that the Board's bias against him is evidenced by its denial of his motion to disqualify the Board's counsel, Ms. Matthews. The Board denied the motion as moot, stating that "Ms. Matthews is no longer serving the Board as Counsel on this matter." (Board's order dated March 25, 1987) Petitioner boldly asserts that either the Board or Ms. Matthews lied because Ms. Matthews purportedly filed an affidavit in a separate action in federal court wherein she acknowledges that she was counsel to the Board in Petitioner's pending license suspension case. Even accepting Petitioner's unsubstantiated version of the facts as true, we fail to see how the affidavit impacts upon the Board's veracity, since Ms. Matthews obviously *was* counsel to the Board for at least several years during the pendency of this action. Petitioner vehemently argues that the Board and its counsel were blatantly prejudiced in favor

of the prosecution. This "blatant prejudice" simply is not apparent from our close reading of the record, and we find that the Board's actions and the procedures it employed in this case, although not flawless, did not rise to such a level as to deprive Petitioner of his right of due process.

For all of the foregoing reasons, we affirm the Board's order of suspension.

ORDER

AND NOW, this 15th day of February, 1989, the order of the State Board of Optometry in the above-captioned matter is hereby affirmed.